UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GEORGE KING, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01348-JRS-DML |
| | ) | |
| KATHY GRIFFIN, | ) | |
| | ) | |
| Respondent. | ) | |

**Order Denying Petition for Writ of Habeas Corpus
and Denying a Certificate of Appealability**

Petitioner George King is serving a 50-year sentence for his 2002 Marion County, Indiana, conviction of two counts of attempted murder. He brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, Mr. King's petition for a writ of habeas corpus is **denied**. In addition, the Court finds that a certificate of appealability should not issue.

**Factual and Procedural Background**

District court review of a habeas petition presumes all factual findings of the state court to be correct, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007). On direct appeal, the Indiana Court of Appeals summarized the relevant facts of the case:

> King and Kay King ("Kay") are brother and sister. Their father, George King ("George"), was a multimillionaire. In 1999, Kay worked for George's investment company, and he gave Kay power of attorney. King lived with George at his residence in Indianapolis. Kay and King had a strained relationship and often quarreled over who would control George's multimillion-dollar estate after his death.

> In the summer of 2000, Kay and King clashed. King yelled, "I'm going to kill you." Dana Miller, George's nursing aid, witnessed part of the fight. Miller heard Kay ask King, "Are you going to shoot me?" Miller saw King nod his head affirmatively and respond, "Yeah."
>
> In October 2001, Kay saw King remove mail from her mailbox. During the same timeframe, one of Kay's neighbors saw King's car stop at Kay's mailbox on numerous occasions. Later, Kay learned that change-of-address orders had been executed with the post office that changed the delivery of her investment and trust accounts to George's address, where King lived.
>
> On the evening of November 14, 2001, Kay's fifteen-year-old son, C.K. drove her car home from his confirmation class. C.K. pulled into their garage and turned off the car. As C.K. and Kay sat talking, a man wearing a ski mask and trench coat appeared on the passenger side of the car. He had his right hand covered with a fast-food sack. The man removed the sack and fired a revolver at Kay and C.K. through the passenger window. C.K. was shot twice, in his neck and shoulder. Kay was shot five times; she sustained injuries to her face, shoulder, and hand. C.K. restarted the car and backed out of the garage. The assailant pursued them and continued to fire at Kay and C.K. as they drove away. Kay's neighbors reported seeing a thin man with a stature similar to King's, wearing dark clothing and running away from Kay's garage that night.
>
> C.K. sought help at a nearby fire station. Firefighters administered medical aid to Kay and C.K. before they were transported to the hospital. When firefighters questioned Kay and C.K. as to the identity of their attacker, they both identified King as the assailant. Marion County Sheriff's Deputy Bradley Beaton interviewed C.K. at the fire station. C.K. told Deputy Beaton that King had shot him and his mother. C.K. said that he recognized King as the assailant because of his eyes, mouth, and build. Later at the hospital, Marion County Sheriff's Department Detective John Maloney interviewed Kay and C.K. separately; both identified King as the attacker.

*King v. State*, 799 N.E.2d 42, 45 (Ind. Ct. App. 2003); *see also* dkt. 13-6.

Mr. King was charged with two counts of attempted murder, aggravated battery as a Class B felony, battery as a Class C felony, and carrying a handgun without a license as a Class A misdemeanor. The case proceeded to a jury trial on August 19-22, 2002, and the jury found

Mr. King guilty on all charges. On November 20, 2002, the trial court sentenced Mr. King to concurrent terms of 50 years for the attempted murder convictions and vacated all other convictions based on double-jeopardy principles. Dkt. 13-1.

Mr. King appealed to the Indiana Court of Appeals. He raised several claims, including that the evidence was insufficient to support his convictions because Kay's and C.K.'s identifications were dubious. He also claimed that his right to cross-examination and due process were violated when the trial court allowed Kay's recorded statement to be presented to the jury despite having been taken after Kay supposedly underwent hypnosis.

On November 24, 2003, the Indiana Court of Appeals affirmed Mr. King's convictions. *King*, 799 N.E. 2d at 42. Mr. King petitioned the Indiana Supreme Court to assume jurisdiction over his case and raised the same claims he had raised to the Indiana Court of Appeals. Dkts. 13-7, 13- 8. On February 4, 2004, the Indiana Supreme Court denied transfer. Dkt. 13-9. Mr. King then filed a petition for a writ of certiorari in the United States Supreme Court. Dkt. 13-10. On October 6, 2004, the writ was denied. Dkt. 13-11.

On September 29, 2005, Mr. King filed a petition for post-conviction relief in the trial court ("PCR court"), which was dismissed by the PCR court due to Mr. King's refusal to be transported for hearing. The petition was reinstated by the Indiana Supreme Court on August 22, 2008. Dkt. 13- 19.

An evidentiary hearing was held in the trial court on October 21, 2014 (PCR App. Vol. II 18-19).[1] On April 12, 2016, the PCR court issued findings of fact and conclusions of law denying

---

[1] The Court will refer to the trial transcript as Trial Tr. and the PCR appendix on appeal as PCR App. throughout this Order.

relief (PCR App. Vol. II 20, 43-71). Mr. King appealed to the Indiana Court of Appeals claiming that trial and appellate counsel were ineffective. Dkts. 13-21, 13-22, & 13-23. On January 17, 2017, the Indiana Court of Appeals issued its decision affirming the PCR court's denial of relief. Dkt. 13-25. Mr. King petitioned the Indiana Supreme Court to assume jurisdiction over his case. Dkts. 13-25, 13-26. On April 20, 2017, the Indiana Supreme Court denied transfer. Dkt. 13-27.

On April 25, 2017, Mr. King filed this petition for a writ of habeas corpus.

## Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). Mr. King's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"); *see Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

The Supreme Court has described the AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and has emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

Where a claim has been adjudicated on the merits in state court, habeas relief is available under the deferential AEDPA standard only if the state court's determination was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Thus, "under AEDPA, federal courts do not independently analyze the petitioner's claims; federal courts are limited to reviewing the relevant state court ruling on the claims." *Rever v. Acevedo*, 590 F.3d 533, 536 (7th Cir. 2010). "A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 131, 141 (2005) (internal citations omitted). "Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010) (citing *Ward v. Sternes,* 334 F.3d 696, 704 (7th Cir. 2003)); *see also Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015). "The habeas applicant has the burden of proof to show that the application of federal law was unreasonable." *Harding v. Sternes*, 380 F.3d 1034, 1043 (7th Cir. 2004) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

## Discussion

Mr. King argues that, on direct appeal, the Indiana Court of Appeals unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979), and unreasonably determined the facts. Because analysis of the reasonableness of the state court's application of *Jackson* will rest, at least in part, on the facts of the case, the Court will first analyze the reasonableness of the Indiana Court of Appeals' determination of the facts.

### I. Determination of Facts

"Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy*, 604 F.3d at 399–400 (7th Cir. 2010) (citing *Ward*, 334 F.3d at 704). The Indiana Court of Appeals statement of the facts as adduced at trial was recited at the beginning of this Order. Mr. King specifically challenges the Indiana Court of Appeals' determination of the facts appearing in the discussion section of the opinion:

> Immediately after the shooting, Kay and C.K. identified King as the assailant to firefighters who administered medical aid to them. Tr. at 469, 480, 485–86. At the fire station, C.K. told Deputy Beaton that King had shot him and Kay. *Id.* at 718. Later at the hospital, Kay and C.K. told Deputy Maloney that King was the assailant. *Id.* at 732, 734. Kay and C.K. stated that King wore a ski mask and trench coat during the shooting but that they recognized him because of his eyes, frame, posture, and hands. *Id.* at 226–28, 422–23. Kay and C.K. testified that King shot them several times with a revolver. *Id.* at 217–23, 414–16. In all of their statements, Kay and C.K. unequivocally identified King as their assailant. *Id.* at 469, 480, 485, 732, 734, 216, 412. We decline King's invitation to reweigh the evidence and assess the credibility of witnesses. The identification evidence is sufficient to support King's convictions for attempted murder.

*King*, 799 N.E.2d at 46.

The relevant question is whether this determination of the facts ignored the clear and convincing weight of the evidence. Mr. King argues that it does and, to support his contention, lists several discrepancies between Kay and C.K.'s initial statements after the shooting and their statements at trial. The Court finds that these discrepancies, and the exclusion of them from the Indiana Court of Appeals' rendition of the facts, do not render that court's determination of the facts contrary to the clear and convincing weight of the evidence. In other words, when determining the facts of the case, the Indiana Court of Appeals may have ignored discrepancies between what first responders reported Kay and C.K. said on the scene or within the first several

days following the shooting and what Kay and C.K. recalled at trial. But a lack of attention to these discrepancies in either the statement of facts or the appellate court's discussion of the facts does not equate with a lack of attention to the clear and convincing weight of the evidence.

Mr. King provides several examples of purported discrepancies. For example, Mr. King argues that Investigator Maloney testified that Kay told him the shooter wore gloves, while C.K. told him the shooter did not wear gloves. Tr. Trans. 798, 734. And yet at trial, both Kay and C.K. testified that they remembered the shooter's thin and hairy hands. *Id.* at 228, 423.

As another example, Mr. King argues that "C.K. initially told the police that the shooter wore sneakers but at trial admitted he never actually saw the shooter's feet." Dkt. 36, p. 8.

Mr. King also asserts that Kay's identification was unreliable because "Kay initially said she thought it *might* be her brother." Dkt. 27, p. 38 (emphasis in original). But to support this assertion, Mr. King points to the trial testimony of firefighter Landry Smiley whose testimony on this point was contradictory. Mr. Landry recalled stating at his deposition that Kay had said "I think it might have been my brother," Tr. Trans. 469-470, but he also testified that Kay unhesitatingly identified her brother as the shooter, *id.* at 472-473.

Although the Indiana Court of Appeals characterized the witnesses' identification of Mr. King as "unequivocal," *King*, 799 N.E.2d at 46, a social worker's notes recorded that, the day after the shooting, C.K. stated that he could not be sure who shot him but he thought it was his uncle. Dkt. 27-9. When asked about the social worker's notes at trial, C.K. testified that he did not recall his conversation with her. Dkt. 439.

Minor inconsistencies across eyewitness statements, such as these highlighted by Mr. King, are normal and do not render the statements unrealiable. *See, e.g., Askew v. City of Chicago,* 440

F.3d 894, 896–97 (7th Cir. 2006) (identifications were reliable despite radio dispatch reporting that witnesses said perpetrator had a gun, while statements from the witnesses at the scene were that he had a knife).

The AEDPA does not require the state court to include every factual discrepancy explored at trial when it determines the facts of the case. Instead, the determination of facts must not ignore the clear and convincing weight of the evidence. *See Goudy*, 604 F.3d at 399–400 (citations omitted). Here, the two eyewitnesses both identified Mr. King as the shooter when they were first questioned by firefighters, when they were questioned by police in between the incident and trial, and finally at the jury trial.

Perhaps it would have been better if the Indiana Court of Appeals had not characterized the identifications as "unequivocal," but it is not this Court's job to analyze whether the state appellate court's determination of the facts was ideal. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

This Court's review is limited to analyzing whether the state appellate court's determination of the facts was unreasonable. "A witness who initially expresses doubt about being able to identify a suspect but then later tells police she recognizes a familiar face need not be considered mistaken or dishonest." *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015). And failing to highlight potential discrepancies in its determination of the facts does not render the state court's determination of the facts unreasonable.

There is no evidence that either C.K. or Kay ever identified any other person as the shooter. Although details of their statements may have changed over time, or various first responders may

have written down statements by C.K. and Kay that C.K. and Kay later denied, refuted, or simply failed to recall, the clear and convincing weight of the evidence is that both C.K. and Kay identified Mr. King as the shooter. They did so, despite the fact that the shooter wore a mask, based on their familiarity with him as a brother and uncle who lived nearby and interacted with them often. The state court's determination of the facts was reasonable and Mr. King has not shown that he is entitled to relief on this claim.

Mr. King also argues that Kay was exposed to hypnosis while in the hospital before being questioned by police and that this hypnosis renders her identification of Mr. King unreliable. Mr. King notes that he is not challenging the formal admissibility of Kay's statements. Dkt. 36, p. 11. Instead, he argues that the reference to hypnosis in Kay's medical records is yet another factor that undercuts the reliability of her identification of Mr. King. *Id*. At trial, Mr. King objected to Kay's identification on the basis of the medical record referencing hypnosis, but after questioning Kay outside the presence of the jury and determining that the reference to hypnosis referred to breathing and relaxation techniques Kay had been shown in the hospital when blood clots were making it difficult to breathe, the trial court overruled his objection. Tr. Trans. 260-65. Although the record is relatively undeveloped on this point, it does not support a finding that the reference to hypnosis in the medical records, either on its own or in combination with the other factors raised by Mr. King, rendered Kay's identification inadmissible or the state court's determination of the facts unreasonable.

Finally, Mr. King's reliance on social science research on eyewitness identification of familiar subjects does not alter this outcome. Mr. King argues that "[s]cientifically-designed research studies have consistently shown that prior familiarity can adversely affect the reliability

of an eyewitness identification in nuanced, complex, and often counterintuitive ways." Dkt. 36, p. 18.[2] But the same article quoted by Mr. King also states that "[a]s a general matter, the accuracy of facial recognition and identification increases as a function of familiarity," and "[t]o a degree…increased interaction time does seem to produce marginally more accurate identifications." Coleman, *et al*., at 53.

The main study discussed in the article involves the comparison of victims who interacted with their perpetrator for 30-60 seconds to those who interacted with their perpetrator for 4-12 minutes. Those with increased exposure to the perpetrator were more likely to identify someone, often the wrong person, than those whose interaction with the perpetrator was very brief. None of the test subjects were familiar with their perpetrators before the tested incident. Such situations are a far cry from those where the perpetrator is someone the victim has known for years, or even their entire lifetime. The article acknowledges that poor lighting, which may have been an issue in this case, and the partial concealing of the subject's face, which was an issue here, reduced the rate of correct identification of known subjects by 18%. *Id*. at 54. Although significant, this does not render the state court's determination of the facts unreasonable.

## II. Application of Relevant Precedent

Mr. King argues that the Indiana Court of Appeals unreasonably applied Supreme Court precedent when it determined that the evidence against Mr. King, including the eyewitness identifications by Kay and C.K., were sufficient to sustain Mr. King's conviction.

---

[2] Quoting James E. Coleman Jr., Theresa A. Newman, Neil Vidmar, and Elizabeth Zoeller, "Don't I Know You? The Effect of Prior Acquaintance/Familiarity on Witness Identification," *The Champion* (April 12, 2012), *36-APR Champion 52*.

The Supreme Court provided the standard for sufficiency of the evidence claims in habeas petitions in *Jackson v. Virginia*, 443 U.S. 307 (1979). In that case, the Court explained that "evidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the *essential elements of the crime* beyond a reasonable doubt." 443 U.S. at 319 (emphasis added). "[H]abeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable." *Saxon v. Lashbrook*, 873 F.3d 982, 987–88 (7th Cir. 2017). "Federal review of these claims . . . turns on whether the state court provided fair process and engaged in reasoned, good-faith decisionmaking when applying *Jackson*'s 'no rational trier of fact' test." *Gomez v. Acevedo*, 106 F.3d 192, 199 (7th Cir. 1999).

Mr. King bases his sufficiency of the evidence claim on his contention that Kay and C.K.'s identifications of Mr. King as the shooter were not reliable because their statements regarding the appearance of the shooter evolved over time, becoming more detailed and more congruous, and because there is evidence Kay was responsive to hypnosis in the hospital. The significance of these factors was discussed in the previous section in relation to the reasonableness of the state court's determination of the facts.

In addressing this challenge to the sufficiency of the evidence, the Indiana Court of Appeals stated:

> Our standard of review when considering the sufficiency of evidence is well settled. We will not reweigh the evidence or consider the credibility of witnesses. Only the evidence most favorable to the verdict together with all reasonable inferences that

can be drawn therefrom will be considered. If a reasonable trier of fact could have found the defendant guilty based on the probative evidence and reasonable inferences drawn therefrom, then a conviction will be affirmed.

*King*, 799 N.E.2d at 46. Applying this standard to Mr. King's claim, the court held:

> Immediately after the shooting, Kay and C.K. identified King as the assailant to firefighters who administered medical aid to them. Tr. at 469, 480, 485–86. At the fire station, C.K. told Deputy Beaton that King had shot him and Kay. *Id.* at 718. Later at the hospital, Kay and C.K. told Deputy Maloney that King was the assailant. *Id.* at 732, 734. Kay and C.K. stated that King wore a ski mask and trench coat during the shooting but that they recognized him because of his eyes, frame, posture, and hands. *Id.* at 226–28, 422–23. Kay and C.K. testified that King shot them several times with a revolver. *Id.* at 217–23, 414–16. In all of their statements, Kay and C.K. unequivocally identified King as their assailant. *Id.* at 469, 480, 485, 732, 734, 216, 412. We decline King's invitation to reweigh the evidence and assess the credibility of witnesses. The identification evidence is sufficient to support King's convictions for attempted murder.

*Id.*

The Indiana Court of Appeals accurately stated the *Jackson* standard. Mr. King argues that the court's application of *Jackson* was unreasonable because no reasonable trier of fact could have found Mr. King guilty based on the eyewitness testimony of Kay and C.K.

The Court has already determined that the Indiana Court of Appeals' determination of the facts was reasonable. In applying the standard in *Jackson* to the facts of the case, the state court first declined to reweigh the evidence or assess witness credibility then held that the identification evidence was sufficient to support Mr. King's convictions. Although the state court does not elaborate on its reasoning for holding that the identifications were sufficient, and therefore a reasonable trier of fact could find Mr. King guilty, AEDPA does not require a lengthy analysis, merely one that reasonably applies federal law. *See Dassey v. Dittman*, 877 F.3d 297, 314 (7th Cir. 2017) (en banc).

Here, the witnesses saw the shooter at close range. Although he wore a ski mask covering his face, it is not unreasonable to conclude that a sibling and nephew could identify their relative while he wore a ski mask. Mr. King describes several discrepancies between Kay and C.K.'s initial descriptions of the shooter and their descriptions at trial, as discussed at length in the prior section of this Order. These inconsistencies over time do not render the witness identifications inadmissible. *See Askew,* 440 F.3d at 896–97. Nor do they render the identification so dubious that the state court's application of *Jackson* was unreasonable.

The petitioner's reliance on *Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001), is unpersuasive. In that case, Mr. Piaskowski was convicted of conspiring to murder a coworker. The only evidence against him was (1) testimony that he was at the scene of the initial assault of the victim, and (2) testimony from another trial witness that the witness heard that "everybody" at the scene assaulted the victim. *Id*. at 689-690. The court questioned the reliability of the first witness who learned of Mr. Piaskowski's presence at the scene through a conversation with one of the known perpetrators who, according to the witness, had drunk 40 beers when he relayed the story. That, combined with discrepancies in his statement and his later recantation of some of it, including that the perpetrator had named Mr. Piaskowski as being present, led the Seventh Circuit to state that the testimony of this witness alone would have been insufficient to convict Mr. Piaskowski. *Id*. at 692.

Ultimately, the Seventh Circuit accepted that the testimony placed the defendant at the scene of the assault, but held that such testimony, combined with the other testimony that "everybody" had assaulted the victim, did not constitute proof beyond a reasonable doubt that the defendant had participated in the incident either directly or through a conspiracy. *Id*. at 693.

The eyewitness identifications of the shooter in this case are distinguishable from the evidence in *Piaskowski*. Certainly a perpetrator in a mask is more difficult to identify. But reasonable triers of fact could find a masked perpetrator guilty based solely on the eyewitness identifications of two of the perpetrator's close relatives, even if there are discrepancies in the details of those identifications.

The Indiana Court of Appeals' analysis, although brief, demonstrates that it "engaged in reasoned, good-faith decision-making" when applying the *Jackson* standard to Mr. King's claim. First, it set forth the state analog to the *Jackson* standard. *Gomez*, 106 F.3d at 199. It then set forth evidence from the record that in its view was sufficient to establish Mr. King's identity—namely, that both Kay and C.K. identified Mr. King as the shooter immediately after the shooting and at trial. Because the state court reasonably applied the *Jackson* standard, Mr. King cannot show that he is entitled to relief on this claim.

## Conclusion

This Court has carefully reviewed the state record in light of Mr. King's claims and has given such consideration to those claims as the limited scope of its review in a habeas corpus proceeding permits. Having applied the appropriate standard of review, and having considered the pleadings and the record, Mr. King's petition for writ of habeas corpus must be **denied.**

Judgment consistent with this Order shall now issue.

## Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal. Federal law requires that he first obtain a [certificate of appealability (COA)] from a circuit justice or judge. A COA may issue 'only if the

applicant has made a substantial showing of the denial of a constitutional right.'" *Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773-74 (2017) (citations omitted).

"At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* (*citing Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).

Applying these standards, and pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts, and 28 U.S.C. § 2253(c), the Court finds that reasonable jurists would not find "it debatable whether the petition states a valid claim of the denial of a constitutional right" or "debatable whether [this Court] was correct in its procedural ruling," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), and that the issues presented are not of such novelty as to deserve further debate. The Court therefore denies a certificate of appealability.

**IT IS SO ORDERED.**

Date: 1/17/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Amy Adelson
LAW OFFICES OF AMY ADELSON LLC
aadelson@lawdea.com

Daniela Elliott
LAW OFFICES OF AMY ADELSON LLC
delliott@lawdea.com

Chandra Hein
INDIANA ATTORNEY GENERAL
chandra.hein@atg.in.gov